MEDTRONIC, INC. and Medtronic Puerto Rico, Inc., Appellees,

v.

DAIG CORPORATION, Appellant.

Appeal No. 85–2645.

United States Court of Appeals, Federal Circuit.

April 30, 1986.

Malcolm L. Moore, Williamson, Bains, Moore & Hansen, Minneapolis, Minn., argued for appellant Daig Corp.

Robert T. Edell, Merchant, Gould, Smith, Edell, Welter & Schmidt, Minneapolis, Minn., argued for appellees. With him on brief was Albert L. Underhill. Joseph F. Breimeyer, Medtronic, Inc., Minneapolis, Minn., of counsel.

Before BISSELL and ARCHER, Circuit Judges, RE, Judge.*

BISSELL, Circuit Judge.

Daig Corporation (Daig) appeals from a judgment of the United States District Court for the District of Minnesota,[1] which found U.S. Patent No. 3,902,501 ('501) not proved invalid under 35 U.S.C. § 103 and infringed in a patent infringement action instituted by the assignee of the '501 patent, Medtronic, Inc. and its wholly-owned subsidiary, Medtronic Puerto Rico, Inc. (collectively called Medtronic). We affirm.

## BACKGROUND

A. The Invention

A pacemaker is a device comprised of a pulse generator, a lead and a power source which is used to provide electrical stimulation to the heart in order to restore an acceptable heart rate in a patient whose rate is too low or erratic.

The two major types of pacemaker leads are myocardial leads and endocardial (or transvenous) leads. Myocardial pacemaker leads are either sutured or screwed into the tissue of the outside of the heart. The surgery necessary for myocardial lead fixation is disadvantageous because of the attendant trauma to the patient, the risks associated with major surgery, and the extended recuperation time. Endocardial

---

* The Honorable Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation.

1. Reported at 611 F.Supp. 1498, 227 USPQ 509 (D.Minn.1985).

leads were developed to alleviate the problems that accompany myocardial lead implantation.

An endocardial lead is inserted inside the heart through a vein. This requires a minor surgical procedure under local anesthesia, requiring a small incision in the vein through which the lead is passed to the desired location in the heart.

The invention of the '501 patent is directed to an endocardial pacemaker lead structure for transvenous implantation having a pacing electrode at its distal tip.[2] This endocardial electrode, or tined lead, provides a means of passively fixing a medical electrode to heart tissue, particularly the trabeculae[3] of the ventricles[4] and the right atrial appendage.[5] The patented structure is a lead having a plurality of pliant, nonconducting tines which extend away from an exposed metal electrode tip and cooperate within the heart to hold the exposed electrode tip against the heart wall. This provides a suitable electrical relationship for transmitting pulses from a pacemaker pulse generator to the heart to properly time, or pace, the patient's heart beats. The tines provide this fixation without damaging or penetrating the heart tissue.

### B. Proceedings and the District Court Opinion

Medtronic charged Daig with infringement of claim 1 of the '501 patent and U.S. Patent No. 3,737,579. Daig answered denying infringement and counterclaimed for a declaration of invalidity, and asserted antitrust violations. Daig later charged

Medtronic with infringement of U.S. Patent 4,236,529 assigned to it. Medtronic defended by asserting patent invalidity and sought a declaratory judgment to that effect. The two actions were consolidated for trial. The trial judge ordered the trial trifurcated with the issues of patent validity and infringement to be tried first, the issues of damages relating to patent infringement to be tried second, and the issues of liability and damages relating to the antitrust and unfair competition claims to be tried to a jury last. When the trial commenced the court heard and received evidence with respect to claim 1 of the '501 patent only. The remaining issues were severed for a later, separate trial.

After a bench trial, the trial judge prepared a 107 page discussion of findings of fact and conclusions of law and adjudged the '501 not proved invalid and the accused devices used by Daig infringing claim 1 of the '501 patent.

### ISSUE

Whether the trial judge erred in finding that claim 1 of the '501 patent was not obvious in view of the prior art.

### OPINION

█ Daig presented this court with the same analysis of the prior art and testimony that was presented to the trial judge. It is not the role of this court to review *de novo* proceedings of a district court. Daig bears the burden of showing that the trial judge, in deciding the ques-

2. Claim 1 of the '501 patent is:
    1. In an endocardial lead of the type having an electrical conductor encased in a material which is generally inert to body fluids, the conductor terminating at an exposed electrically conductive electrode tip, the improvement which comprises:
    nonconducting tine means extending from said encasing material and away from said tip from a location adjacent said tip for cooperating with heart tissue, to hold the tip in position, said tine means forming a generally acute angle with said encasing material and being entirely of a pliant material having sufficient rigidity to maintain said angle when said tine means are unrestrained, but suffi-

ciently pliant to prevent penetration of said heart tissue, said pliant material being generally inert to body fluids.

3. Trabeculae are lattice-like structures or small bundles of muscle fibers in the ventricular apex or the right atrial appendage.

4. The ventricles are the lower chambers of the heart which receive blood from a corresponding atrium (the upper chamber of the heart) and from which blood is forced into the arteries.

5. The right atrial appendage is the ear-or auricle-like pouch of the right atrium.

tion of obviousness, committed reversible legal error, or that its probative findings underlying the legal conclusion were clearly erroneous in light of the record made at trial. *Carl Schenck, A.G. v. Norton Corp.,* 713 F.2d 782, 785, 218 USPQ 698, 700 (Fed.Cir.1983); *see also, Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1555, 225 USPQ 26, 30 (Fed.Cir.1985); *Atlas Powder Co. v. E.I. DuPont DeNemours & Co.,* 750 F.2d 1569, 1573, 224 USPQ 409, 411 (Fed.Cir.1984). The "clearly erroneous" standard is satisfied when this court is left with the firm conviction that error has been committed. *See, e.g., Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 956, 220 USPQ 592, 596 (Fed.Cir.1983), *cert. denied,* — U.S. —, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984).

Daig argues that the trial judge erred in that he misunderstood the problem that the '501 invention overcame, misinterpreted the teachings and disclosures of the prior art, failed to understand the differences between certain prior art and the claimed invention and failed to consider the prior art as a whole in determining obviousness. Daig further argued that the record evidence does not establish commercial success attributable to the claimed tined lead.

### OBVIOUSNESS

In assessing nonobviousness the following factual inquiries must be made: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of secondary considerations such as long-felt need, unexpected results, or commer-

cial success. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966); *see, e.g., Simmons Fastener Corp. v. Illinois Tool Works, Inc.,* 739 F.2d 1573, 1575, 222 USPQ 744, 746 (Fed.Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985).

The trial judge, Judge Larson, recognized the requisite *Graham* inquiries. He properly stated that prior art references "include pacemaker leads and catheter-like devices in general." A person of ordinary skill in this art in 1972 was determined to "have had a master's degree in electrical or mechanical engineering coupled with a basic knowledge of the physiology and anatomy of the heart and vascular system." Judge Larson proceeded to articulate a detailed analysis of the prior art cited to the U.S. Patent and Trademark Office and the additional references that were introduced at trial, with each reference reviewed for what it taught and disclosed.[6]

■ No contest is had with the scope of the prior art or the level of ordinary skill in the art determinations. Instead, Daig's challenge with the trial's outcome begins with the premise that the problem solved by the '501 invention was incorrectly identified as the:

development of an endocardial pacemaker lead with a means of passive fixation to reduce the incidence of lead dislodgement in the ventricles and right atrial appendage and to lessen the risk of tissue penetration or damage in the veins and heart chambers.

Nevertheless, Daig offers no alternative articulation of the problem and merely

---

6. A. The prior art cited to the PTO and principally relied on at trial included the following:
   M. Schaldach, *New Pacemaker Electrodes,* 17 American Society for Artificial Internal Organs 29 (1971);
   W. Portsmann, J. Witte, *et al., P Wave Synchronous Pacing Using Anchored Atrial Electrode Implanted Without Thoracotomy,* 30 The American Journal of Cardiology 74 (July 1972);
   United States Patent No. 3,835,864 (Rasor);
   United States Patent No. 3,719,190;
   United States Patent No. 3,717,151;
   United States Patent No. 3,516,410;

B. Prior art not cited to the PTO but considered at trial include:
   German Patent No. 2,053,919
   J. Spickler, N. Rasor, *et al., Totally Self-Contained Intracardiac Pacemaker,* 3 Journal of Electrocardiology 325 (1970);
   United States Patent No. 3,492,996;
   United States Patent No. 3,635,223;
   Vitatron article, *Pacemaker Electrode,* 4 Bio-Medical Engineering 383 (1969);
   Medtronic Endocardial leads Models 6901 and 6907.

urges this court to find error in "undue emphasis" being placed on the lead dislodgement aspect of the problem. Daig continues by asserting that errors occurred in the discussion of the Schaldach article and the Rasor patent and that by analyzing the prior art references individually, the trial court failed to consider the references as a whole. However, the alleged errors in the trial judge's understanding of the Schaldach article and Rasor patent amount to nothing more than argument. Judge Larson's interpretation of the references is amply supported by the record; it is not clearly erroneous.

We now turn our attention to the trial judge's discussion of the prior art teachings "as a whole." Under Rule 52(a) of the Federal Rules of Civil Procedure, in a non-jury trial, "the court shall find the facts specially and state separately its conclusions of law thereon . . . ." This court has recognized that failure to make specific factual findings is an abuse of discretion. *See, e.g., Seattle Box Co., Inc. v. Industrial Crating & Packing*, 756 F.2d 1574, 1578, 225 USPQ 357, 360 (Fed.Cir.1985) (it was error for the court to limit its statements on the equitable components of intervening rights to a mere ultimate conclusion, without any explanation of the particular factors and facts it considered); *Jones v. Hardy*, 727 F.2d 1524, 1529, 220 USPQ 1021, 1025 (Fed.Cir.1984) (failure to make specific *Graham* findings constituted error). Such a failure has not occurred in this case.

While Rule 52(a) does require specific fact findings to be stated, the rule is not so severe as to require the trial judge to articulate every imaginable permutation and combination of prior art teachings. "The ultimate test of the adequacy of findings is whether they are sufficiently comprehensive and pertinent to the issue to form a basis for the decision (and whether they are supported by the evidence)." *Loctite Corporation v. Ultraseal Ltd.*, 781 F.2d 861, 862, 872, 228 USPQ 90, 98 (Fed.Cir. 1985). While a complete discussion of all possible permutations and combinations of the prior art would remove all doubt about whether the trial court properly reviewed the prior art for its total teachings, we are convinced by the "express[ed] and necessarily implied findings" that Judge Larson properly viewed the prior art as a whole. *Id.; see also, Jones v. Hardy*, 727 F.2d 1524, 1531, 220 USPQ 1021, 1027 (Fed.Cir. 1984) ("An appellate court's function is to review judgments, not opinions"); *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 862, 226 USPQ 402, 408 (Fed.Cir.1985) ("This court passes on judgments, not opinions"). We presume that a fact finder reviews all the evidence presented unless he explicitly expresses otherwise.[7]

After conducting a thorough analysis of the prior art, the trial judge continued the *Graham* analysis by considering evidence of secondary considerations: commercial success, long-felt need in the medical community, contemporaneous invention, and other attempts to solve the problem of endocardial lead dislodgement. Daig sought to rebut Medtronic's commercial success claim by introducing evidence that no nexus existed between claimed commercial success and the tines of the '501 leads. The evidence and arguments regarding Medtronic's commercial success were evaluated as follows:

---

7. We are convinced that Judge Larson considered the prior art references for their combined teachings in arriving at the legal conclusion of nonobviousness as is indicated by his statement:

> The Court has attempted diligently to make the basic factual inquiries under § 103, as *Graham* requires, and to examine the results of those inquiries. The Court has also examined the evidence of secondary considerations. Upon full consideration *of all the evidence*, the Court finds that the invention

claimed in the '501 patent would not have been obvious to a person having ordinary skill in the art at the time the invention was made. None of the prior art references, *either alone or in combination*, would have taught, disclosed, or suggested to a person of ordinary skill in the art the use of soft, pliant, nonconductive tines as a means of passive fixation for cooperating with heart tissue to hold the lead tip in position without penetrating the heart tissue. (Emphasis added.)

*Medtronic*, 611 F.2d at 1534, 227 USPQ at 535.

The Court has considered the evidence with respect to commercial success, and although the Court is not prepared to accept Medtronic's conclusion that its tined leads enjoyed tremendous commercial success, the Court is similarly not prepared to accept Daig's ... conclusion that the Medtronic tined leads enjoyed absolutely no commercial success. The Court, however, is satisfied that the Medtronic tined leads have enjoyed sufficient commercial success to suggest the nonobviousness of the tined endocardial lead disclosed in the '501 patent. In so concluding, the Court is not unaware of Daig's ... concern that Medtronic tined leads should not be viewed as generic devices with tines, but rather individual devices with varied features and improvements other than tines. The Court is also not unaware of the possible influence that some of these varied features and improvements, such as a Multi-Filar coil and a ring tip electrode, may have had on tined lead sales ....

....

In reaching the conclusion that the Medtronic tined lead has enjoyed some commercial success, the Court is not unmindful of Dr. Plotkin's conclusion to the contrary. Dr. Plotkin was an amply qualified and credible expert microeconomist, and his conclusion with respect to the commercial success of the tined lead was rooted deeply in economic theory and the capital market standard. His reliance on economic theory, however, perhaps so skewed his reasoning as to limit its applicability in terms of commercial success for purposes of this patent action. Dr. Plotkin defined commercial success for the tined lead, which he considered a product innovation, to be an aggressive growth in market share. He could find no commercial success for Medtronic tined leads because the tined leads showed no aggressive growth in market share, and, in fact, the tined leads appeared to cannibalize Medtronic's existing endocardial lead market. Dr. Plotkin's definition and analysis of commercial success focused clearly, if not

exclusively, on the economic effect of the product innovation, the tined lead, on the product innovator, Medtronic. Dr. Plotkin's definition and analysis of commercial success did not look to the effect, of any kind, of the product innovation on the industry as a whole. Such a definition and analysis could lead to the conclusion that a product innovation *per se* was not a commercial success, but the same product innovation nonetheless had a profound influence on the industry and market. That conclusion may well be what Dr. Plotkin offered the Court. In a pure economic analysis, using, as Dr. Plotkin described it, the "tough" capital market standard, the Medtronic tined lead was probably not commercially successful. In a rather pragmatic analysis, however, looking to a pacing industry which now intensively markets tined leads, and to a medical community which now regards tined leads as leads of choice, the Medtronic tined lead was commercially successful. The Court is satisfied that Medtronic has shown that its tined leads, which embody the advantages inherent in the endocardial lead disclosed in the '501 patent, have enjoyed sufficient commercial success to suggest nonobviousness (footnote omitted).

*Medtronic,* 611 F.Supp. at 1531–32, 227 USPQ at 533–34.

In conclusion, Daig has merely argued to this court the same arguments made at trial concerning the obviousness/nonobviousness of the '501 patent. The trial judge articulated a careful analysis and we are not persuaded that reversible legal error has occurred in the determination that the invention of the '501 would not have been obvious; nor are we convinced that the trial judge's findings underlying that determination are clearly erroneous.

As a final effort to prove obviousness of the '501 invention, Daig urges this court to adopt the conclusion of a German tribunal holding the '501 German counterpart patent obvious. This argument is specious. The patent laws of the United States are the laws governing a determination of obvi-

ousness/nonobviousness of a United States patent in a federal court. *See In re Dulberg,* 472 F.2d 1394, 176 USPQ 525 (CCPA 1973); *In re Larsen,* 292 F.2d 531, 130 USPQ 209 (CCPA 1961).

For the foregoing reasons, we affirm the judgment that Daig failed to prove the '501 patent invalid.

AFFIRMED.